TAGGED OPINION



**ORDERED in the Southern District of Florida on January 12, 2024.**

_____
**Scott M. Grossman, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

MICHAEL MCINTOSH and
AMANDA MCINTOSH,

     Debtors.

_____/

Case No. 02-25039-SMG

Chapter 7

### MEMORANDUM OPINION AND ORDER
### SANCTIONING FLORIDA CREDIT RESEARCH, INC.
### FOR VIOLATING THE DISCHARGE INJUNCTION

When Amanda McIntosh – a single mother and registered nurse – checked her bank balance while at work one day, she "freaked out." The bank app on her phone showed a negative balance, even though she had over $21,000 on deposit. Ms. McIntosh was shocked and thought she had been the victim of identity theft. But she was not the victim of identity theft. No, she was the victim of an overzealous

creditor – Florida Credit Research, Inc. – that unlawfully garnished her bank accounts to collect a discharged debt.

Ms. McIntosh is now before this Court – the Court that issued her bankruptcy discharge over twenty years ago – seeking to hold Florida Credit Research in contempt of court and requesting actual and punitive sanctions for violating the discharge injunction. Florida Credit Research has since released its writ of garnishment, ceased its collection efforts, and acknowledged the debt it sought to collect had in fact been discharged. But it argues it should not be held in contempt because, under the Supreme Court's 2019 decision in *Taggart v. Lorenzen*,[1] there was a "fair ground of doubt"[2] as to whether collection of this debt violated the discharge injunction. Under this standard, civil contempt may be appropriate only "when the creditor violates a discharge order based on an *objectively unreasonable* understanding of the discharge order or the statutes that govern its scope."[3]

After separate trials first on entitlement to sanctions and then on the amount of sanctions, the Court concludes that Florida Credit Research's actions were based on an objectively unreasonable understanding of Ms. McIntosh's bankruptcy discharge, and that there was no fair ground of doubt that collection of this twenty-year-old, discharged debt violated the discharge injunction. Florida Credit Research is therefore in contempt of court and will be sanctioned in the amount of $64,686.93,

---

[1] 587 U.S. ---, 139 S. Ct. 1795 (2019).
[2] *Id.* at 1799.
[3] *Id.* at 1802 (emphasis added).

consisting of $33,124.62 in actual compensatory sanctions for legal fees and costs incurred, $10,000.00 for emotional distress, and $21,562.31 in punitive sanctions.

## I.    Jurisdiction, Authority, Venue, and Procedure.

Under Bankruptcy Code section 524(a)(2), a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action"[4] to collect a discharged debt.[5] "Congress intended the discharge injunction 'to eliminate any doubt concerning the effect of the discharge as a total prohibition of debt collection efforts' and to ensure that 'once a debt is discharged, the debtor will not be pressured in any way to repay it.'"[6] "The cessation of pressure to pay in and of itself is a prime purpose of the discharge, a tradeoff for debtors having subjected themselves to the rigors of the bankruptcy process."[7]

Bankruptcy courts enforce this injunction through their statutory contempt powers granted under Bankruptcy Code section 105(a), which provides that "the bankruptcy court 'may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].'"[8] "Together, sections 524(a)(2) and 105(a) authorize a court to impose civil contempt sanctions for attempting to collect a discharged debt when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order."[9] In this way, "a court may hold a creditor in civil contempt for violating a discharge

---

[4] 11 U.S.C. § 524(a)(2).
[5] *See In re Roth*, 935 F.3d 1270, 1275 (11th Cir. 2019).
[6] *In re Anderson*, 641 B.R. 1, 43 (Bankr. S.D.N.Y. 2022) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 80-81 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 365-66 (1977)).
[7] *Id.* (citing *In re Mooney*, 340 B.R. 351, 362 n.29 (Bankr. E.D. Tex. 2006)).
[8] *Roth*, 935 F.3d at 1275 (quoting 11 U.S.C. § 105(a)).
[9] *Id.* (quoting *Taggart*, 139 S. Ct. at 1801) (cleaned up).

order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct."[10]

The Court has subject matter jurisdiction under 28 U.S.C. § 1334(b),[11] because Ms. McIntosh's claim for relief arises under Bankruptcy Code sections 727 (discharge), 524 (effect of discharge), and 105 (power of court).[12] This matter is a core proceeding,[13] which the Court has authority to hear and determine under 28 U.S.C. § 157(b) and the general order of reference from the United States District Court for the Southern District of Florida.[14] "[I]t is 'well established that the discharge is the foundation upon which all other portions of the Bankruptcy Code are built.'"[15] As the Court that issued Ms. McIntosh's discharge order, this Court "'alone possesses the power to enforce compliance with and punish contempt of that order,' and this 'power to sanction contempt is jurisdictional.'"[16]

Venue is proper in this District under 28 U.S.C. § 1409(a). And under Federal Rule of Bankruptcy Procedure 9020, a motion for contempt is a contested matter governed by Federal Rule of Bankruptcy Procedure 9014.[17]

---

[10] *Id.* (quoting *Taggart*, 139 S. Ct. at 1799) (emphasis in original).

[11] *See* 28 U.S.C. § 1334(b) (conferring on the district court "original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11 [the Bankruptcy Code].").

[12] *See In re McLean*, 794 F.3d 1313, 1319-20 (11th Cir. 2015) (bankruptcy court had jurisdiction to entertain contempt motion for violation of the discharge injunction).

[13] *In re Ajasa*, 627 B.R. 6, 11 (Bankr. E.D.N.Y. 2021) ("Enforcement of the discharge injunction is a core proceeding arising under the Bankruptcy Code."); *In re WVF Acquisition, LLC*, 420 B.R. 902, 906 (Bankr. S.D. Fla. 2009) (enforcement of the discharge injunction is a core proceeding "because the relief requested is 'integrally involved in the bankruptcy court's authority to enforce its own orders.'") (quoting *In re Thigpen*, 2004 WL 6070299, at *3 (Bankr. S.D. Ala. 2004)).

[14] S.D. Fla. Local Rule 87.2(a).

[15] *Anderson*, 641 B.R. at 15 (quoting *In re Anderson*, 884 F.3d 382, 389 (2d Cir. 2018)).

[16] *McLean*, 794 F.3d at 1318-19 (quoting *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 970 (11th Cir. 2012); citing *Cox v. Zale Del., Inc.*, 239 F.3d 910, 917 (7th Cir. 2001)).

[17] *See id.* at 1326.

## II.    Background.

This matter is before the Court on Ms. McIntosh's motion for sanctions against Florida Credit Research for violating the discharge injunction,[18] which she filed together with a motion to reopen her closed twenty-year-old bankruptcy case on April 14, 2023.[19] The Court held a preliminary hearing on these motions on May 10, 2023.[20] In advance of that hearing, Florida Credit Research filed a response in opposition to the motion for sanctions[21] and Ms. McIntosh filed a reply.[22]

At the May 10 hearing, the Court granted the motion to reopen[23] and scheduled an evidentiary hearing for August 15, 2023, to consider entitlement to sanctions but not the amount of any award.[24] That was to be the subject of a separate evidentiary hearing if the Court first found Ms. McIntosh entitled to sanctions against Florida Credit Research.[25] The order setting this first evidentiary hearing contained deadlines for completion of discovery, for expert and pretrial disclosures, for exchange of exhibits and objections thereto, and to file briefs in support of and in opposition to the motion for sanctions.[26]

Ms. McIntosh and Florida Credit Research timely filed their briefs in advance of the August 15 evidentiary hearing.[27] Two witnesses testified at this evidentiary

---

[18] ECF No. 11.
[19] ECF No. 10.
[20] ECF No. 14.
[21] ECF No. 17.
[22] ECF No. 18.
[23] ECF No. 19.
[24] ECF No. 21.
[25] *Id.*
[26] *Id.*
[27] ECF No. 28, 34.

hearing: (1) James Jacobson, who owned both Florida Credit Research and the law firm of Jacobson, Sobo & Moselle, and (2) Mark Rickard, Florida Credit Research's state court counsel, who for many years worked at Jacobson, Sobo, & Moselle, and who now has his own law firm called Law Guard. At the conclusion of the evidentiary hearing, after considering the testimony of Mr. Jacobson and Mr. Rickard, along with the exhibits admitted into evidence[28] and certain judicially noticed documents,[29] the Court announced orally its finding that Florida Credit Research had violated the discharge injunction and that as a result, Ms. McIntosh was entitled to sanctions. The Court then scheduled another evidentiary hearing for December 12, 2023, to consider the amount of sanctions.[30] The order setting this second evidentiary hearing provided additional deadlines – for initial, expert, and pretrial disclosures, to complete discovery, and to exchange and object to exhibits – all related to the amount of sanctions.[31]

The Court conducted this second evidentiary hearing on December 12, 2023. Although Florida Credit Research's bankruptcy counsel attended, participated in, and made argument at the hearing, neither Mr. Jacobson, Mr. Rickard, nor any other client representative of Florida Credit Research was present. The Court heard testimony from two witnesses – Ms. McIntosh and her daughter. Considering their

---

[28] ECF Nos. 36, 37.
[29] ECF No. 38.
[30] ECF No. 39.
[31] *Id.*

testimony, the exhibits admitted into evidence,[32] and the unobjected-to proffers of counsel, the Court now makes the following findings of fact and conclusions of law.[33]

## III.  Findings of Fact.

A.    Ms. McIntosh's 2002 "No-Asset" Chapter 7 Bankruptcy Case.

Ms. McIntosh filed a joint chapter 7 bankruptcy petition with her then-spouse Michael McIntosh on July 8, 2002.[34] She listed 35 unsecured creditors on her bankruptcy schedules, including the following $7,400.00 credit card debt incurred in October 1997 to Direct Merchants Bank, PO Box 21550, Tulsa OK 74121:



There was no evidence – and Florida Research Credit has not contended – that this debt was for anything other than unpaid credit card bills. In other words, Florida Credit Research has not contended this was a non-dischargeable debt for money to the extent obtained by false pretenses, a false representation, or actual fraud, or by use of a materially false written statement;[35] for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;[36] or for willful and malicious injury by the debtor to another entity or to the property of another entity.[37]

---

[32] ECF Nos. 50, 51.

[33] *See* Fed. R. Bankr. P. 9014(c) (Federal Rule of Bankruptcy Procedure 7052, which incorporates Federal Rule of Civil Procedure 52, applies to contested matters); Fed. R. Bankr. P. 7052; Fed. R. Civ. P. 52(a).

[34] ECF No. 1.

[35] *See* 11 U.S.C. § 523(a)(2).

[36] *See* 11 U.S.C. § 523(a)(4).

[37] *See* 11 U.S.C. § 523(a)(6).

Ms. McIntosh's bankruptcy case was a "no-asset" chapter 7 case,[38] meaning the chapter 7 trustee determined there was no non-exempt property available for distribution to creditors. Because her case was a "no-asset" case, under Federal Rule of Bankruptcy Procedure 2002(e),[39] no deadline to file proofs of claim was ever set.[40] On October 22, 2002, Ms. McIntosh received a discharge under 11 U.S.C. § 727.[41]

    B.    <u>Florida Credit Research's 2003 Lawsuit and Judgment</u>.

Florida Credit Research – which was owned by Mr. Jacobson, a now-retired attorney – was in the business of purchasing bad debts from credit card companies. It had, over the years, purchased – and then pursued collection of – well over ten thousand debts. Much of that collection work was done by the law firm of Jacobson, Sobo & Moselle, which Mr. Jacobson also owned, and where Mr. Rickard worked for many years.

On March 20, 2003 – five months *after* Ms. McIntosh received her chapter 7 discharge – Florida Credit Research, as assignee of Metris Companies, Inc., sued her in state court to collect on a $7,382.90 debt. There was no evidence as to how Florida Credit Research acquired its claim from Metris Companies, or whether Metris Companies was Ms. McIntosh's original creditor, and if not, how (and from whom) Metris Companies acquired its claim against Ms. McIntosh. Further, due to its age

---

[38] ECF No. 4.

[39] *See* Fed. R. Bankr. P. 2002(e):

       (e) NOTICE OF NO DIVIDEND. In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims.

[40] ECF No. 3.

[41] ECF No. 7.

and that it predated the advent of electronic case filing, no copy of the original complaint could be located.

A copy of Florida Credit Research's final judgment, however, does exist. It shows that on November 19, 2003, a Florida state court entered final judgment in favor of Florida Credit Research, Inc., as assignee of Metris Companies, Inc., c/o Jacobson, Sobo & Moselle, and against Ms. McIntosh, for the following amounts:[42]

| | |
|---|---|
| Principal | $7,382.90 |
| Costs | $220.00 |
| Prejudgment Interest[43] | $4,616.31 |
| Attorneys Fees | $800.00 |
| **Total** | **$13,019.21**, plus statutory interest. |

There was no evidence that for the next nineteen-plus years any action was taken to enforce this judgment.[44]

C.    Florida Credit Research's 2023 Collection Efforts.

Then on February 6, 2023, Florida Credit Research filed a motion for proceedings supplementary to execution in state court, seeking to collect on this nearly twenty-year-old judgment. In an affidavit accompanying that motion, Mr. Rickard stated that Ms. McIntosh owed $24,839.19 as of that date. Although nearly twenty years had gone by, Florida Credit Research did not conduct any search (including a national PACER[45] search) to see if its judgment debtor had filed for

---

[42] ECF No. 11, at 10.

[43] The amount of prejudgment interest as of November 19, 2003 ($4,616.31) relative to the amount of principal debt ($7,382.90) is consistent with this debt having been incurred long before Ms. McIntosh filed her bankruptcy case on July 8, 2002.

[44] Under Fla. Stat. § 55.081, a Florida judgment lien expires after 20 years.

[45] PACER is the Public Access to Court Electronic Records service, which provides electronic public access to federal court records. On PACER, registered users can search for a case in the federal court where the case was filed or search a nationwide index of federal court cases. *See*

bankruptcy. But Florida Credit Research clearly did some investigation, because it was able to identify a bank where Ms. McIntosh had money on deposit. A few days after filing its motion for proceedings supplementary, Florida Credit Research then sought, obtained, and served on JPMorgan Chase Bank, N.A. a writ of garnishment. JPMorgan Chase Bank responded that it was holding $21,117.46 in three accounts: Ms. McIntosh's savings account, her checking account, and a joint account shared with her daughter (who was a high school senior at the time).

Shortly thereafter, Ms. McIntosh checked her bank balance on her phone while at work and "freaked out" because it showed a negative balance. She contacted her bank, fearing she had been the victim of identity theft. Instead, she learned her accounts had been garnished. The bank provided her contact information for an attorney for Florida Credit Research. Ms. McIntosh then called that attorney[46] and asked if this had anything to do with a bankruptcy case she had filed many years ago. The attorney told her if she had some paperwork regarding her bankruptcy case, she should send it to him.

Notwithstanding Ms. McIntosh's testimony – which the Court found to be credible – Mr. Rickard claims the first time he learned Ms. McIntosh had filed for bankruptcy was when she served an answer and motion to dissolve the writ of garnishment on March 21, 2023, to which she attached a copy of the docket and the

---

https://pacer.uscourts.gov. According to the PACER website "The PACER system was established by the Judicial Conference in 1988 as a way to improve public access to court information, which then typically required a trip to the local courthouse. Today, PACER provides the public with instantaneous access to more than 1 billion documents filed at more than 200 federal courts – nearly all the documents filed by a judge or the parties in any case." https://pacer.uscourts.gov/about-us.

[46] It was not clear from her testimony if this attorney was Mr. Rickard. But Mr. Rickard was Florida Credit Research's only attorney of record on its state court filings in the garnishment proceedings.

creditor list from her 2002 bankruptcy case. That creditor list contained 45 names and addresses, including "Direct Merchants Bank, PO Box 21550, Tulsa OK 74121." Because her bankruptcy case was so old, however, the underlying filings (including her bankruptcy schedules) were not available electronically on the Court's CM/ECF system.

On March 27, 2023 – after clearly being put on notice that Ms. McIntosh had previously filed for bankruptcy and was asserting this debt had been discharged – Florida Credit Research nevertheless filed a motion for final judgment in garnishment in the state court. In its motion, Florida Credit Research asserted that because neither it nor Metris Companies (the entity from whom Florida Credit Research claims to have acquired the debt on which it sued to obtain the judgment) were listed on the creditor list in Ms. McIntosh's bankruptcy case, this debt was an "unscheduled" debt that was not discharged under Bankruptcy Code section 523(a)(3). According to Florida Credit Research, it was therefore entitled to a final judgment in garnishment.

D.    Contempt Proceedings Against Florida Credit Research.

On April 14, 2023, Ms. McIntosh moved to reopen her twenty-year-old chapter 7 bankruptcy case[47] and filed a motion for sanctions against Florida Credit Research for violating the discharge injunction.[48] This Court then issued a notice of hearing on April 25, 2023, setting a May 10, 2023 hearing on both the motion to reopen and the

---

[47] ECF No. 10. After the motion to reopen was filed, the Court requested copies of the underlying filings from archives, which upon retrieval were then placed on the electronic CM/ECF docket.
[48] ECF No. 11.

motion for sanctions.[49] That same day – April 25, 2023 – Florida Credit Research filed a voluntary dissolution of the writ of garnishment in state court, which resulted in Ms. McIntosh finally regaining access to her accounts after more than two months. At the May 10 hearing, the Court set the August 15 evidentiary hearing to consider the threshold issue of whether Ms. McIntosh was entitled to sanctions against Florida Credit Research.

At the outset of the August 15 evidentiary hearing, Florida Credit Research admitted the debt it was seeking to enforce was the $7,400.00 debt listed on Ms. McIntosh's bankruptcy schedules as owed to Direct Merchants Bank. The evidence at trial showed that in 2003 "Direct Merchants Bank" issued credit card statements with an address listed as PO Box 21550, Tulsa, OK 74121-1550, and with directions to "make payments payable to Direct Merchants Bank."[50] That is the same address Ms. McIntosh listed for this creditor on her bankruptcy schedules.

Mr. Rickard testified that "Direct Merchants Bank" was not an actual bank, but instead was a registered trademark owned by Metris Companies, which Metris Companies then licensed to its subsidiary, Direct Merchants Credit Card Bank, N.A., to use as a "d/b/a." Mr. Rickard knew this because he had represented Florida Credit Research in thousands of collection lawsuits as its attorney, including as an attorney at Jacobson, Sobo & Moselle, where he had worked from late 1999 through 2014. He

---

[49] ECF No. 14.

[50] There was no evidence, however, of any credit card statements issued to Ms. McIntosh for this debt. The evidence offered and admitted at trial were Direct Merchants Bank credit card statements for other debtors from roughly the same time period, all from Florida state court lawsuits by Florida Credit Research, Inc., as assignee of Metris Companies, Inc., filed by the Jacobson, Sobo & Moselle law firm.

demonstrated an extensive knowledge and understanding of Florida Credit Research's practices and procedures in acquiring debts from other companies; the relationship between Metris Companies and Direct Merchants Bank, from whom Florida Credit Research had purchased thousands of debts for collection over the years; and Florida Credit Research's practices and procedures in seeking to collect these debts. Consistent with Mr. Rickard's testimony, Mr. Jacobson also testified that Florida Credit Research had filed over 10,000 collection actions and did business with Metris Companies and Direct Merchants Bank on multiple occasions.

At the December 12 evidentiary hearing to consider an appropriate award of sanctions, the Court heard testimony from Ms. McIntosh and her daughter about the emotional distress Florida Credit Research's actions caused Ms. McIntosh. With her savings and checking accounts frozen pending entry of a final judgment in garnishment, Ms. McIntosh was unable to provide her daughter with many of the accoutrements attendant to being a senior in high school – including a new prom dress and a class ring. Her daughter also could not go on a senior class trip, and Ms. McIntosh had to delay paying for her daughter's driving lessons. Although Ms. McIntosh had previously prepaid for a trip to Chicago with her daughter to celebrate her senior year, because of the garnishment Ms. McIntosh now had very little spending money – with the funds she had set aside for meals and entertainment having been garnished – with which to enjoy this trip with her daughter.

During this time Ms. McIntosh had trouble paying some bills, she had to open a new bank account to receive her paychecks, and, as a single mother on a nurse's

salary, she suffered significant emotional distress over how she would be able to pay for her daughter's college education. She was also concerned with how she would even be able to afford lawyers to fight this wrongful garnishment, with the source of savings she might otherwise have used to pay legal fees having been garnished. Ms. McIntosh testified that because of the garnishment, she was emotionally unavailable to share in the joy of her daughter's senior year due to her worries about her savings having been garnished for a debt she understood to have been discharged twenty years earlier.

The Court received evidence of the legal fees and costs Ms. McIntosh incurred in connection with this matter. Her bankruptcy counsel, Robert Gusrae, Esq., billed her $19,635.00 in legal fees through November 20, 2023, representing 56.1 hours of work at $350 per hour. The Court also received (without objection) Mr. Gusrae's proffer that he did an additional 4.0 hours of work since that invoice and through the December 12 hearing, also at $350 per hour, resulting in $1,400.00 in additional fees. His bill also included $2,707.62 in costs for two depositions. These fees and costs due to Mr. Gusrae – which the Court finds to be entirely reasonable – total $23,742.62.

In addition to Mr. Gusrae's fees and costs, Ms. McIntosh presented the invoice of attorneys Ofer Shmucher, Esq. and Shera Anderson, Esq., who represented Ms. McIntosh in state court with respect to the writ of garnishment. Their invoice sought a total of $18,722.00 for 44.09 hours of work. Florida Credit Research objected to certain entries on that invoice, however, as being duplicative of Mr. Gusrae's work or as being unrelated to this bankruptcy case and instead for preparation of a

potential lawsuit under the Federal Fair Debt Collection Practices Act and the Florida Consumer Collection Practices Act. The Court agrees with Florida Credit Research that the time spent on these matters is not compensable here, nor is the work that was duplicative of Mr. Gusrae's work. The Court therefore finds a reduction of $9,340.00 from Mr. Shmucher and Ms. Anderson's bill is appropriate, resulting in $9,382.00 as reasonable attorneys' fees for the work they did to fight the writ of garnishment.

### III.    Conclusions of Law.

Florida Credit Research argues that because it was enforcing a debt it did not see listed on Ms. McIntosh's bankruptcy schedules, it could safely assume the debt was an unscheduled debt that was not discharged, and if Ms. McIntosh contended otherwise, it was her burden to prove so. As discussed below, Florida Credit Research's position ignores the plain text of Bankruptcy Code section 523(a)(3), turns the scope of a chapter 7 discharge on its head, and was objectively unreasonable in every respect.

### A.    Bankruptcy Discharge Generally.

The goal of most individual chapter 7 debtors is to obtain a discharge of their prepetition debts under Bankruptcy Code section 727(a).[51] Except for certain types of debts specifically excepted from discharge (more on this below), a chapter 7 bankruptcy discharge "discharges the debtor from all debts that arose before the date

---

[51] 11 U.S.C. § 727(a).

of the order for relief under" chapter 7.[52] A bankruptcy discharge provides a debtor with "a financial 'fresh start' by 'releasing the debtor from personal liability with respect to any discharged debt.'"[53] Under Bankruptcy Code section 524,[54] a discharge voids "any past or future judgments on the debt" and operates "as an injunction to prohibit creditors from attempting to collect or to recover the debt."[55] The discharge injunction "is perhaps the most important feature of the discharge. That injunction helps to ensure that the debtor's 'fresh start' is realized by prohibiting creditors from attempting to collect discharged debts."[56]

Violation of the discharge injunction may be punished as contempt of court[57] under a bankruptcy court's "inherent power to punish contempt against it,"[58] and under Bankruptcy Code section 105(a),[59] which empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of"[60] the Bankruptcy Code. "A finding of civil contempt must be based on 'clear and convincing evidence' that a court order was violated."[61] This standard "is

---

[52] 11 U.S.C. § 727(b). The date of the order for relief in a voluntary chapter 7 case is the date the petition is filed. 11 U.S.C. § 301(b).

[53] *In re Diaz*, 647 F.3d 1073, 1087 (11th Cir. 2011) (quoting *Tenn. Student Assistance Corp. v. Hood,* 541 U.S. 440, 447 (2004)) (cleaned up).

[54] 11 U.S.C. § 524.

[55] *Hood*, 541 U.S. at 447 (citing 11 U.S.C. §§ 524(a)(1), (2); 3 W. Norton, BANKRUPTCY LAW AND PRACTICE 2D § 48:1, p. 48-3 (1998)).

[56] *Diaz*, 647 F.3d at 1087 (citing *In re Jet Fla. Sys., Inc.,* 883 F.2d 970, 972 (11th Cir. 1989)).

[57] *Taggart*, 139 S. Ct. at 1801.

[58] *McLean*, 794 F.3d at 1319 (citing *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1553 (11th Cir. 1996)).

[59] *Id.*

[60] 11 U.S.C. § 105(a).

[61] *Jove Eng'g, Inc.*, 92 F.3d at 1545 (citing *Jordan v. Wilson*, 851 F.2d 1290, 1292 n.2 (11th Cir. 1988); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1534 n.4 (11th Cir. 1986)).

more exacting than the 'preponderance of the evidence' standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt."[62]

Although *Taggart* imposed restrictions on a court's ability to impose civil contempt sanctions for violation of the discharge order, nothing in *Taggart* suggests any modification to a debtor's prima facie burden to prove by clear and convincing evidence that a creditor violated the discharge order.[63] What *Taggart* does is essentially provide an affirmative defense to the creditor, which only comes into play after the debtor makes her prima facie case. Thus, even if a court finds by clear and convincing evidence that a creditor violated the discharge order, the court may only "impose civil contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order.[64] If the creditor can establish a fair ground of doubt as to whether its actions violated the discharge order, under *Taggart* the court cannot impose civil contempt sanctions.[65]

### B.    Exceptions to Discharge Generally.

Even when a debtor receives a discharge, certain types of debts may be excepted from that discharge.[66] For some of these potentially non-dischargeable debts (debts arising from certain specifically enumerated bad acts),[67] a creditor must file a

---

[62] *Id.* (quoting *Jordan*, 851 F.2d at 1292).

[63] *See In re DiBattista*, 615 B.R. 31, 39 n.9 (S.D.N.Y. 2020) ("The *Taggart* Court did not discuss whether the clear-and-convincing standard is still appropriate on a civil contempt motion, but cases that have dealt with such motions post-*Taggart* have continued to use the clear-and-convincing standard.") (citing *Calvillo Manriquez v. Devos*, 411 F. Supp. 3d 535, 540 (N.D. Cal. 2019)).

[64] *Taggart*, 139 S. Ct. at 1801.

[65] *Id.* at 1799.

[66] *See generally* 11 U.S.C. § 523(a).

[67] *See* 11 U.S.C. § 523(a)(2) (debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, or by use of a materially false written statement); 11 U.S.C. § 523(a)(4) (debts for fraud or defalcation

timely complaint to determine dischargeability, otherwise the debt will be discharged.[68] For any other type of potentially non-dischargeable debt, however, a determination of dischargeability may be sought at any time[69] by either the debtor or a creditor, in either the bankruptcy court or in state court.[70] And ordinarily, it is the creditor's burden to prove (by preponderance of the evidence) that its debt is excepted from the debtor's discharge.[71]

In "asset" cases (where a claims bar date is set because there are assets available for distribution to creditors), Bankruptcy Code section 523(a)(3) excepts from discharge debts not listed by the debtor or scheduled in time to permit the creditor to timely file a proof of claim or seek a determination of dischargeability. In those "asset" cases where a creditor argues it didn't receive timely notice, it is the debtor's burden to prove the creditor had notice or actual knowledge of the case.[72] In a "no asset" case like Ms. McIntosh's, however, a creditor's notice or actual knowledge of the case is not relevant, so the burden to prove its debt was not discharged still lies with the creditor.[73]

---

while acting in a fiduciary capacity, embezzlement, or larceny); 11 U.S.C. § 523(a)(6) (debts for willful and malicious injury by the debtor to another entity or to the property of another entity).

[68] *See* 11 U.S.C. § 523(c); Fed. R. Bankr. P. 4007(c).

[69] *See* 11 U.S.C. § 523(c); Fed. R. Bankr. P. 4007(b).

[70] *See* Fed. R. Bankr. P. 4007(a); *In re Levin*, 284 B.R. 308, 312 (Bankr. S.D. Fla. 2002) ("state courts have concurrent jurisdiction with the bankruptcy court to determine the dischargeability of most debts under section 523 of the Code.") (citing *Cummings v. Cummings*, 244 F.3d 1263, 1267 (11th Cir. 2001); *McQuade v. McQuade (In re McQuade)*, 232 B.R. 810, 813 n.1 (Bankr. M.D. Fla. 1999); *In re Crowder*, 37 B.R. 53, 55 (Bankr. S.D. Fla. 1984)).

[71] *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991); *Griffith v. U.S. (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir. 2000); *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 677 (11th Cir. 1993).

[72] *Matter of Faden*, 96 F.3d 792, 795 (5th Cir. 1996) (citing *U.S., Small Bus. Admin. v. Bridges*, 894 F.2d 108, 111 (5th Cir. 1990)); *In re Massa*, 187 F.3d 292, 296 (2d Cir. 1999) (citing *Dependable Ins. Co. v. Horton (In re Horton)*, 149 B.R. 49, 57 (Bankr. S.D.N.Y. 1992)).

[73] *See* note 71, *supra*.

C.    The Unscheduled Debts Exception to Discharge under Section 523(a)(3).

Bankruptcy Code section 523(a)(3) excepts from discharge a debt:

(3) neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

> (A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

> (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.[74]

In other words, for a debt that does not arise from certain enumerated bad acts set forth in section 523(a)(2), (a)(4), or (a)(6), if the debt is not listed or scheduled by the debtor *in time to allow the creditor to file a timely proof of claim*, that debt is not discharged, unless the creditor had notice or actual knowledge of the case (in which case it is discharged). And for a debt that did arise from those enumerated bad acts, that debt also will not be discharged if it is not listed or scheduled *in time for the creditor to both file a timely proof of claim and a timely request for determination of dischargeability of the debt*, unless the creditor had notice or actual knowledge of the case (again, in which case it will still be discharged).[75]

The Supreme Court has recently confirmed the longstanding principle of bankruptcy jurisprudence that exceptions to discharge "should not extend beyond

---

[74] 11 U.S.C. § 523(a)(3).
[75] *See* 4 COLLIER ON BANKRUPTCY ¶ 523.09 (16th ed. 2023) ("A debt is excepted from discharge if it was not scheduled in time to permit timely action by the creditor to protect its rights, unless the creditor had notice or actual knowledge of the case.").

their stated terms."[76] The stated terms of section 523(a)(3)(A) only except from discharge debts that are not scheduled in time to permit timely filing of a proof of claim. In a case where there are insufficient assets available for distribution to creditors, however, and the notice of meeting of creditors directs creditors <u>not</u> to file proofs of claim (like the notice did here),[77] there is no deadline to file a proof of claim. Because the exception to discharge under section 523(a)(3)(A) for unscheduled debts applies only to cases where there is a deadline to file proofs of claim – and there was no such deadline in this case – the exception does not apply here. In other words, whether or not Ms. McIntosh listed this debt on her bankruptcy schedules, it was still discharged as a matter of law. As explained by a leading bankruptcy law treatise:

> It is not uncommon for a debtor to discover, after the entry of the discharge order and the closing of a no-asset chapter 7 bankruptcy case, that a creditor was omitted from the schedules. Some debtors, apparently believing that debts must be scheduled to be discharged, have moved to reopen the case to amend the schedules to add the creditor. Some courts have permitted this unless there is evidence of fraud or intentional design in omitting the creditor from the schedules. Other courts have refused to permit the reopening of a bankruptcy case to permit a debtor to schedule an omitted debt.
>
> **Under the language of section 523(a)(3)(A) it is unnecessary to reopen a case to obtain a discharge of an unscheduled debt in a no-asset case.** In a no-asset chapter 7 case, no deadline is set for the filing of claims. Therefore, the lack of notice to the creditor does not deprive the creditor of the opportunity to file a timely proof of claim. *In such circumstances, unless the debt falls within subsection 523(a)(2), (a)(4) or (a)(6), it is discharged.* If the debt does fall within those subsections, since the deadline for filing a dischargeability complaint will have passed before the case is closed, reopening the case will not alter the fact that the debt is nondischargeable. Nevertheless, a bankruptcy court has the discretion to reopen a case to permit a debtor

---

[76] *Bartenwerfer v. Buckley*, 598 U.S. 69, 77 (2023).

[77] The notice here said, "Please Do Not File A Proof of Claim Unless You Receive a Notice To Do So." (ECF No. 3).

to amend the schedules to add a creditor so that the debtor may have an accurate list of the discharged debts, thereby assisting, in a practical manner, in the implementation of the debtor's fresh start.[78]

Notwithstanding this widely-accepted explanation of section 523(a)(3)'s applicability in no-asset chapter 7 cases, Florida Credit Research argues there is a "fair ground of doubt" as to whether its claim was discharged under the Eleventh Circuit's 1986 decision in *Matter of Baitcher*.[79] Further, because Florida Credit Research (allegedly) could not determine whether its claim was scheduled, it argues Ms. McIntosh had the burden – twenty years after she filed for bankruptcy – to prove she did not fraudulently or intentionally fail to schedule this debt. Florida Credit Research is wrong, and *Baitcher* does not create any fair ground of doubt about this.

      D.     <u>*Matter of Baitcher*</u>.

In *Baitcher*, debtor Barbara Baitcher filed a no-asset chapter 7 case in which she failed to list a creditor, John Samuel.[80] After she received a discharge and her case was closed, Samuel obtained a judgment against her in state court for a prepetition debt.[81] The debtor then moved to reopen her bankruptcy case to add Samuel's name to her list of creditors.[82] The bankruptcy court granted that motion, and then permitted the debtor to file an adversary proceeding to determine the dischargeability of the debt under Bankruptcy Code section 523(a)(3).[83] On cross-motions for summary judgment, the bankruptcy court ruled for the debtor,

---

[78] 4 COLLIER ON BANKRUPTCY ¶ 523.09 (16th ed. 2023) (emphasis added).
[79] 781 F.2d 1529 (11th Cir. 1986).
[80] *Id.* at 1530.
[81] *Id.*
[82] *Id.*
[83] *Id.* at 1531.

determining Samuel's debt was discharged.[84] Samuel appealed and the district court

affirmed.[85] Samuel appealed again to the Eleventh Circuit, seeking "reversal on the

ground that his motion for summary judgment should have been granted."[86]

The Eleventh Circuit agreed with Samuel and reversed the district court and

the bankruptcy court, determining that there were disputed issues of fact as to the

dischargeability of Samuel's debt, and holding that the bankruptcy court erred in

granting summary judgment.[87] In deciding that summary judgment should not have

been granted, the Eleventh Circuit suggested that if the debtor could show an honest

mistake – and not "fraud or intentional design" – then she should have her

discharge.[88] But, the Eleventh Circuit held, this issue could not be resolved on

summary judgment.[89]

---

[84] *Id.*

[85] *Id.*

[86] *Id.* at 1532.

[87] *Id.* at 1534. The Eleventh Circuit characterized the bankruptcy court's grant of summary judgment to the debtor as having resulted in a new discharge being "granted to Baitcher, including Samuel's claim," stating that Baitcher "obtained a new discharge applicable to" Samuel. *Id.* at 1531. That was, unfortunately, an incorrect statement of both fact and law. The text and structure of the Bankruptcy Code make clear that a debtor only gets one discharge, which, except for debts excepted from that discharge under section 523, "discharges the debtor from all debts that arose before the [petition date], . . . whether or not a proof of claim . . . is filed . . . or allowed . . . ." 11 U.S.C. § 727(b). The debtor in *Baitcher* had already received a discharge. *Baitcher*, 781 F.2d at 1530. Thus, the bankruptcy court in *Baitcher* did not grant – and could not have granted – the debtor a second discharge (this time of Samuel's debt). What the bankruptcy court actually did was determine whether the debt to Samuel was dischargeable. *See* Fed. R. Bankr. P. 4007(a) ("A debtor or any creditor may file a complaint to obtain a determination of the dischargeability of any debt."). In other words, the bankruptcy court determined whether this debt was included within the scope of the discharge the debtor had already received, or whether it was excepted from that discharge.

[88] *Baitcher*, 781 F.2d at 1534. This "fraud or intentional design" language comes from a 1983 Seventh Circuit decision, *Matter of Stark* – which in turn cited two cases predating the modern Bankruptcy Code of 1978 – in support of the proposition that "a debtor may reopen the estate to add an omitted creditor where there is no evidence of fraud or intentional design." 717 F.2d 322, 324 (7th Cir. 1983) (citing *In re Cafferky*, [1977–78] Bankr. L. Rep. (CCH) ¶ 66,518 (Bankr. E.D. Tenn. July 29, 1977); *In re Callahma*, [1977–78] Bankr. L. Rep. (CCH) ¶ 66,465 (E.D. Ore. May 5, 1977)). This "fraud or intentional design" language, however, is found nowhere in the text of the modern Bankruptcy Code, which became effective on October 1, 1979. *See* Pub. L. No. 95–598, § 402(a), 92 Stat. 2549, 2682 (1978).

[89] *Baitcher*, 781 F.2d at 1534.

22

To the extent *Baitcher* applies at all here, it does not create any fair ground of doubt as to whether Florida Credit Research's debt was discharged. Florida Credit Research has never alleged Ms. McIntosh fraudulently or with "intentional design" failed to schedule Florida Credit Research or any of its predecessors in interest as a creditor. Fraudulent omission or intentional design in failing to list a creditor, however, is the only circumstance in which *Baitcher* might arguably apply.[90] Because that is not the case here, Florida Credit Research's purported reliance on *Baitcher* and cases applying it cannot create any fair ground of doubt as to whether the debt it now seeks to collect was discharged.

But even if one construes *Baitcher* as holding that a debtor's intent is relevant to determine whether under Bankruptcy Code section 350(b)[91] she can reopen a no-asset chapter 7 case to seek a determination of dischargeability of a debt, that

---

[90] *Baitcher* might only arguably apply because its judicially created "equitable rule" – which is found nowhere in the text of the Bankruptcy Code – was actually dicta. *See In re Horlacher*, 2009 WL 903620, at *3 (N.D. Fla. 2009) (noting that in *Baitcher*, "the Eleventh Circuit suggested in dicta that in the absence of fraud or intentional design a Chapter 7 debtor with no assets should be allowed to amend her schedules to include a debt not previously disclosed in the bankruptcy," and stating that *Baitcher*'s "absence of fraud or intentional design" language "was only dicta as to the issue in this case"); *see also In re Garrett*, 266 B.R. 910, 913-15 (Bankr. S.D. Ga. 2001) (analyzing *Baitcher* and construing its "equitable rule" as applying only to whether a case should be reopened under Bankruptcy Code section 350, and not as adding any new judicially created exception to discharge); *cf. In re Hunter*, 116 B.R. 3, 5 (Bankr. D.D.C. 1990) (questioning "[h]ow *Baitcher*, in the face of the statute's plain language, logically could reach the conclusion that intentional omission can make the debt non-dischargeable, even when there is still time to file a claim"). This "equitable rule" was dicta because the actual issue the Eleventh Circuit decided was whether the bankruptcy court appropriately granted summary judgment on the issue of dischargeability of the debt. *See U.S. v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("dicta is defined as those portions of an opinion that are not necessary to deciding the case then before us."); *see U.S. v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) (same) (citing Obiter Dictum, BLACK'S LAW DICTIONARY (10th ed. 2014) (explaining that a statement is dictum if it is "unnecessary to the decision in the case"); Bryan A. Garner, *et al.*, THE LAW OF JUDICIAL PRECEDENT 46 (2016) ("Generally, a dictum is a statement in a judicial opinion that is unnecessary to the case's resolution.")). The Eleventh Circuit's actual holding was simply that the bankruptcy court erred in granting summary judgment because "[t]here were triable issues of fact." *Baitcher*, 781 F.2d at 1535.

[91] Under section 350(b), "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b).

23

holding still does not establish a fair ground of doubt as to whether the debt here was discharged. *Baitcher* does not stand for the proposition that an unscheduled debt in a no-asset case is not discharged, or that if a creditor can create any colorable doubt as to whether the debt was discharged, then the debtor has the burden to reopen her bankruptcy case and seek a determination of its dischargeability. As explained by the bankruptcy court in *In re Garrett*,[92] *Baitcher*'s judicially created "equitable rule" merely limits the forum in which a debtor can seek a determination of dischargeability:

> If the good faith test applies only to Section 523, then *Baitcher* has added a nondischargeable category (bad faith omission from the schedules of a non-fraud claim) that Congress never adopted. If it applies to Section 350 [closing and reopening cases], the case cannot be reopened and dischargeability remains unadjudicated. However, debtors have the right to plead a bankruptcy discharge as an affirmative defense to an action on the debt in state court. The state courts have concurrent jurisdiction to determine dischargeability, at least after the [bankruptcy] case is closed.

> \* \* \*

> Thus, if in a closed "no-asset" case, a non-fraud claim is unscheduled and later sued upon, the debtor may plead Section 523(a)(3) as a defense in the court where the suit is brought. ***What Baitcher does is deny the debtor's right to reopen and obtain a federal forum, if the omission was made through design or fraudulent intent.*** This right may or may not be valuable. It may deprive [the] debtor of what is viewed as a more specialized, and perhaps more sympathetic, forum to litigate this question, or it may not. Whatever the practical effect, the federal forum is lost to the debtor who failed to establish good faith in omitting the debt from debtor's schedules. The *sine qua non* of bankruptcy is full disclosure and the granting of relief to honest but unfortunate debtors. Under *Baitcher,* those who fail the test are not

---

[92] 266 B.R. 910.

> entitled to reopen their case and obtain a determination, in the
> bankruptcy forum, of entitlement to a discharge under Section 523.[93]

Thus, *Baitcher* does not stand for the proposition – as Florida Credit Research posits – that a debtor has the burden to reopen her case to seek a determination of dischargeability of an allegedly unscheduled debt for that debt to be discharged. That debt has been discharged as a matter of law under Bankruptcy Code section 523(a)(3).

    E.    <u>Florida Credit Research Violated the Discharge Injunction</u>.

Florida Credit Research acknowledges it is not asserting Ms. McIntosh intentionally omitted this debt from her schedules or that any omission, if intentional, was the result of fraud or intentional design.[94] With that acknowledgment, *Baitcher* simply does not apply at all here. Accordingly, there was no objectively reasonable basis for Florida Credit Research to believe Ms. McIntosh's failure to move to reopen her bankruptcy case to seek a determination of dischargeability somehow renders Florida Credit Research's claim enforceable because the current holder of the debt didn't see its name listed on her bankruptcy schedules. Indeed, such a construction of the discharge injunction would turn it on its head and render any debt that has been transferred from the original creditor to another entity presumptively nondischargeable, and improperly put the burden on the debtor to prove the new holder of the claim is the successor to the original creditor. To impose this type of burden – in time, money, and aggravation – on a debtor who has already discharged

---

[93] *Id.* at 915-16 (emphasis added; internal citations omitted).
[94] ECF No. 17, at 6.

her debts is absurd and cruel, would eviscerate the protections of the discharge injunction, and certainly is not what *Taggart* requires.

Florida Credit Research's admission that there is no argument Ms. McIntosh intentionally or fraudulently failed to schedule this debt, combined with the plain text of section 523(a)(3), creates no fair ground of doubt that Florida Credit Research was seeking to enforce a discharged debt. Her case was a no-asset chapter 7 case. This was not disputed. She received a chapter 7 discharge. This was not disputed. So even if Florida Credit Research believed the claim it now holds was not listed on her schedules, under Bankruptcy Code section 523(a)(3) it nevertheless was still discharged. And even if *Baitcher* applies, there is no evidence Florida Credit Research had any reason to believe Ms. McIntosh intentionally or fraudulently omitted this debt from her schedules. In sum, there is simply no fair ground of doubt that this debt was discharged, and it was objectively unreasonable for Florida Credit Research to assume otherwise. Ms. McIntosh is therefore entitled to an award of sanctions.

F.    Contempt Sanctions.

As the Eleventh Circuit explained in *In re McLean*,[95] "[b]ankruptcy courts may impose compensatory sanctions for actual damages that a debtor incurs as a result of a creditor's violation of the discharge injunction" under Bankruptcy Code section 105(a).[96] Actual damages can also include emotional distress caused by a violation of the discharge injunction.[97] To recover damages for emotional distress, the debtor

---

[95] 794 F.3d 1313.
[96] *Id*. at 1325.
[97] *Id*.

26

"must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the discharge injunction."[98]

Courts can also impose coercive sanctions for violation of the discharge injunction, "the sole purpose of which is typically to bring an end to an ongoing contempt."[99] And courts can impose punitive sanctions, which are "for offenses already completed."[100] Punitive sanctions "take the form of a fixed fine and have no practical purpose other than punishment."[101] "[I]n bankruptcy as well as other contexts, courts have 'traditionally been reluctant to grant punitive damages absent some showing of reckless or callous disregard for the law or rights of others.'"[102] Thus, "punitive sanctions are appropriate only where a party acted with sufficient notice concerning the legal import of its offending actions."[103]

"Because punitive sanctions are for offenses already completed, they take on the character of criminal punishment and render the contempt criminal in nature."[104] Thus, "due process requires more stringent protections in criminal contempt

---

[98] *Id.* at 1325-26 (quoting *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014)) (cleaned up).

[99] *Id.* at 1323.

[100] *Id.*

[101] *Id.*

[102] *Id.* at 1325 (quoting *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 228 (9th Cir. 1989); citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 548-49 (1999)).

[103] *Id.* (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)).

[104] *Id.* at 1323 (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828-29 (1994)). For civil contempt the due process requirements "are flexible, varying with the circumstances of each case." *Id.* at 1324 (quoting *Mercer v. Mitchell*, 908 F.2d 763, 769 n.11 (11th Cir. 1990)). "At most, due process requires only 'skeletal' protections in civil contempt proceedings: a show-cause order providing notice and a hearing in which the alleged contemnor, who may be represented by counsel, can introduce evidence rebutting the allegation of contempt and testify on its own behalf." *Id.* (citing *Mercer*, 908 F.2d at 767).

proceedings."[105] This includes the presumption of innocence and proof of guilt beyond a reasonable doubt.[106] Although *McLean* appropriately characterized punitive sanctions for contempt as "criminal in nature" – which they are[107] – nothing in *McLean* precludes a bankruptcy court from imposing punitive sanctions for violating its own order.[108] *McLean* simply articulates the more stringent due process protections a bankruptcy court must afford when considering punitive sanctions.[109]

## IV.    Imposition of Sanctions.

### A.    Actual Compensatory Sanctions.

#### 1.    Attorneys' Fees and Costs.

Having considered the appropriate standards for imposition of sanctions against Florida Credit Research, the Court concludes an award of $33,124.62 in actual compensatory sanctions for legal fees and costs is appropriate. This amount consists of $23,742.62 for Mr. Gusrae's legal fees and costs, plus $9,382.00 for Mr. Shmucher's and Ms. Anderson's work in state court fighting the writ of garnishment (but not for the work duplicative of Mr. Gusrae's, nor for the work they

---

[105] *Id*. at 1324.

[106] *Id*. (citing *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798-99 (1987)). For "serious criminal contempts" – which the Supreme Court has defined as those involving imprisonment of more than six months, *Bagwell*, 512 U.S. at 827 – this also includes the right to a jury trial. *McLean*, 794 F.3d at 1324 (citing *Young*, 481 U.S. at 798-99). The punitive sanctions being sought here against Florida Credit Research are monetary only, so the matter before the Court is not a "serious contempt." *See Bloom v. State of Ill.*, 391 U.S. 194, 198 (1968) ("criminal contempt is a petty offense unless the punishment makes it a serious one").

[107] *Bloom*, 391 U.S. at 201 ("Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both.").

[108] *McLean*, 794 F.3d at 1318-19 (the bankruptcy court "'alone possesse[d] the power to enforce compliance with' the discharge injunction.") (quoting *Alderwoods Grp.*, 682 F.3d at 970).

[109] *See id*. at 1325 (remanding the case to the bankruptcy court "so that it may decide how properly to dispose of the [debtors'] request for non-compensatory sanctions" and "remind[ing] the bankruptcy court of the proper standard should it endeavor to impose punitive sanctions on remand.").

did preparing a Federal Fair Debt Collection Practices Act or Florida Consumer Collection Practices Act complaint).

        2.        Emotional Distress.

In addition, the Court will award $10,000.00 as actual compensatory sanctions for the emotional distress Florida Credit Research caused to Ms. McIntosh. As she testified, Ms. McIntosh is a registered nurse and single mother, whose daughter was a high school senior when Florida Credit Research wrongly seized her (and her daughter's) bank accounts to collect a 20-year-old discharged debt. She clearly suffered emotional distress because of Florida Credit Research's conduct.

One thing in life we can never get back is time. Ms. McIntosh and her daughter can never get back the time near the end of her daughter's senior year when they were looking forward to graduation, prom, a class ring, driving lessons, a celebratory trip, and preparing to go to college. Rather than enjoy the savings Ms. McIntosh had squirreled away to spend on her daughter for these things, those funds were frozen, and she instead had to hire lawyers to get them back. Now she has her savings back, and the Court will award her most of the attorneys' fees she seeks. But she can never get back that time with her daughter, or the experiences they were going to share together with that money.

The Court therefore finds, by clear and convincing evidence, that Ms. McIntosh suffered significant emotional distress caused by Florida Credit Research's violation of the discharge injunction.[110] As compensation for this emotional distress, the Court

---

[110] *See id.* at 1325-26.

determines that – while there is no price one can put on time that can never be recaptured – $10,000.00 is an appropriate measure of damages for the significant emotional distress Ms. McIntosh suffered during this time that should have been filled with joy, celebration, and optimism for her daughter's future. Accordingly, the Court will award her a total of $43,124.62 in actual compensatory sanctions, consisting of $33,124.62 in legal fees and costs, plus $10,000.00 for emotional distress.

B.  Punitive Sanctions.

Finally, as to punitive sanctions, the Court finds Florida Credit Research's conduct to have been egregious and reprehensible, and showed "a reckless or callous disregard for the law or rights of others."[111] Ms. McIntosh has proven beyond a reasonable doubt that Florida Credit Research violated the discharge injunction when it sought, obtained, and served a writ of garnishment seeking to collect a discharged debt, and then refused to release the writ until after she moved to reopen her bankruptcy case and sought sanctions, and this Court set those matters for hearing. Heeding *McLean*'s dictates, the Court has afforded Florida Credit Research all due process required before imposing punitive sanctions, including the following:

- Florida Credit Research was served with the motion for sanctions and the notice of hearing on that motion,[112] in which Ms. McIntosh clearly sought punitive damages;[113]

- the Court held a preliminary hearing on the motion for sanctions,[114] at which Florida Credit Research's counsel appeared and made argument, and in advance of which Florida Credit Research filed an objection;[115]

---

[111] *Id.*
[112] ECF No. 15.
[113] ECF No. 11.
[114] ECF No. 14.
[115] ECF No. 17.

- the Court then issued a scheduling order setting an evidentiary hearing to determine whether Ms. McIntosh was entitled to any sanctions against Florida Credit Research, and setting deadlines for discovery, pretrial disclosures, exchange of exhibits, and legal briefs;[116]

- the Court then held an evidentiary hearing to determine whether Ms. McIntosh was entitled to sanctions against Florida Credit Research, at which Florida Credit Research called two witnesses to testify in its defense – its principal James Jacobson and its state court counsel Mark Rickard;

- after that evidentiary hearing, the Court issued a second scheduling order, setting another evidentiary hearing to consider the appropriate amount of sanctions and setting additional deadlines for further discovery, initial and pretrial disclosures, and exchange of exhibits, with respect to this issue;[117]

- in advance of that hearing, Florida Credit Research took additional discovery, including the depositions of Ms. McIntosh and her daughter;[118]

- the Court then held the evidentiary hearing on the amount of sanctions, at which Florida Credit Research again appeared through counsel and had an opportunity to cross-examine Ms. McIntosh's witnesses; and

- at the conclusion of that hearing, the Court entertained argument from both Ms. McIntosh and Florida Credit Research.

Having concluded that Florida Credit Research has been afforded all required due process before considering the imposition of punitive sanctions, the Court next concludes – for the reasons discussed above – that Florida Credit Research showed a reckless or callous disregard for both the law (this Court's discharge order) and the rights of Ms. McIntosh (the protections to which she is entitled as a result of the discharge injunction).[119] Indeed, Florida Credit Research's conduct is indicative of an overly aggressive business model that encourages extortive settlements of debts that by law have been discharged. By proceeding as it had, Florida Credit Research was

---

[116] ECF No. 21.
[117] ECF No. 39.
[118] ECF No. 42, 43.
[119] *McLean*, 794 F.3d at 1325.

betting that rather than bring this case to the bankruptcy court and have a trial, Ms. McIntosh would settle for some lesser amount to make the problem go away. Ms. McIntosh didn't take the bait, but she never should have been in that position to begin with.

The Court finds Florida Credit Research's conduct to have been reckless, reprehensible, and egregious, warranting punitive sanctions.[120] Considering punitive sanctions awards in other cases,[121] the Court determines that punitive sanctions in the amount of $21,562.31, representing 50% of the amount of actual compensatory sanctions awarded, is appropriate here. The Court therefore awards Ms. McIntosh a total of $64,686.93 in sanctions – representing $33,124.62 in attorneys' fees and costs, $10,000.00 for emotional distress, and $21,562.31 in punitive sanctions – against Florida Credit Research.

## V.    Conclusion.

The Court recognizes there is a robust market for the purchase and sale of unpaid debts in this country. Bad debts get traded all the time. To suggest that

---

[120] *See id.*

[121] *See, e.g., In re Withington*, 654 B.R. 173, 188 (Bankr. S.D. Fla. 2023) (awarding $175,607.02 in punitive damages, representing a multiplier of 3.375 times actual damages); *In re Lyubarsky*, 615 B.R. 924, 939 (Bankr. S.D. Fla. 2020) (awarding punitive damages for violation of the automatic stay in the amount of $236,518.50, which was twice the amount of $118,259.25 awarded in actual damages); *In re Ferris*, 611 B.R. 701, 709 (Bankr. M.D. Fla. 2019) (awarding punitive damages of $25,000 for violation of the discharge injunction, in addition to actual damages of over $30,000 in legal fees, costs, and for emotional distress); *In re Harrison*, 599 B.R. 173, 192 (Bankr. N.D. Fla. 2019) (awarding punitive damages of 3.375 times the amount of actual damages); *WVF Acquisition*, 420 B.R. at 915 (awarding punitive damages for violation of the automatic stay in the amount of $50,000, representing an approximately one-to-one ratio to actual damages of $51,995); *Mooney*, 340 B.R. at 361 (awarding $40,000 in punitive damages, representing nearly twice the amount of actual damages, for violation of the discharge injunction); *In re Moon*, 2023 WL 1779643, at *13 (D. Nev. 2023), *appeal dismissed*, 2023 WL 6613781 (9th Cir. 2023) (district court on appeal awarded $128,002.41 in punitive damages, representing a 1.5 multiplier times actual damages).

merely selling a debt to another holder could somehow immunize a creditor and create a fair ground of doubt as to whether that debt was discharged because the new holder of the claim didn't see its name on the debtor's creditor list, however, turns the protections of the bankruptcy discharge on its head. But that's what Florida Credit Research did here. It put its head in the sand and assumed it could enforce this 20-year-old debt simply because insufficient records were available to show it could not. While *Taggart*[122] certainly tightened the standard for imposing sanctions for discharge injunction violations, it did not choke off this avenue for relief entirely.

A debtor who files a chapter 7 case and obtains a discharge necessarily emerges from her bankruptcy case with nothing but exempt assets (if she has any assets at all). She should be able to rely on that discharge and not have to continually hire lawyers to defend against claims of debt purchasers each time a debt is sold. It was reckless, egregious, and reprehensible for Florida Credit Research to have put that onus on her. After considering the evidence, and for the reasons discussed above, the Court concludes that Florida Credit Research violated the discharge injunction in Ms. McIntosh's bankruptcy case and is liable to Ms. McIntosh for sanctions in the total amount of $64,686.93.

Accordingly, it is **ORDERED** that:

1.      Ms. McIntosh's *Expedited Motion for Sanctions Against Florida Credit Research Inc. for Violation of the Discharge Injunction*[123] is **GRANTED**.

---

[122] 139 S. Ct. 1795.
[123] ECF No. 11.

2.      Ms. McIntosh is awarded actual compensatory sanctions in the amount of $43,124.62 against Florida Credit Research, Inc.

3.      Ms. McIntosh is awarded punitive sanctions in the amount of $21,562.31 against Florida Credit Research, Inc.

4.      The Court will enter a separate judgment in favor of Ms. McIntosh and against Florida Credit Research, Inc., in the total amount of $64,686.93.

# # #

Copies furnished to all counsel of record via CM/ECF.